UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HUMAN RIGHTS DEFENSE CENTER,

      Plaintiff,                          Case No. 19-12470
                                             Honorable Thomas L. Ludington

v.

O'BELL WINN, et. al,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

On August 22, 2019, Plaintiff, Human Rights Defense Center, filed a complaint against Defendants: Prison Wardens O'Bell Winn, Bonita Hoffner, Willie Smith, and Carmen Palmer, 30 unnamed prison employee Does, and Michigan Department of Corrections ("MDOC") Director Heidi Washington. ECF No. 1. Plaintiff is a publisher of magazines and materials, such as *Prison Legal News* for inmates about "prisons, jails, and other detention facilities, prisoners' rights, court rulings, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals." *Id.* at PageID.6. Plaintiff alleges that Defendants have censored and withheld its publications to prisoners in Michigan, violating the First Amendment (Count I) and the due process clause from the Fourteenth Amendment (Count II). *Id.* at PageID.32–34. Plaintiff seeks monetary damages against all Defendants in their individual capacities on the First Amendment and due process claims. Plaintiff also seeks injunctive relief against Director Washington in her official capacity on both claims and a declaratory judgment that MDOC violated the Constitution.

On the same day Plaintiff filed the complaint, it also filed a motion for preliminary injunction, seeking to enjoin Defendants from "(1) censoring written materials mailed by HRDC to prisoners in Defendants' prisons and (2) denying HRDC notice and an opportunity to challenge any such censorship decisions." ECF No. 3. In September and October, the parties stipulated to extend the time for Defendants to respond to the complaint and Plaintiff's motion for preliminary injunction. ECF Nos. 18, 21. On October 18, 2019, Defendants jointly filed a motion to dismiss all claims, except the First Amendment claim against Defendant Washington in her official capacity. ECF No. 22. As explained below, Defendants motion to dismiss will be granted in part and denied in part. Also, Plaintiff's motion for preliminary injunction will be denied.

**I.**

Plaintiff, Human Rights Defense Center, is a 501(c)(3) not-for-profit entity that "publishes the monthly newsprint journal *Prison Legal News*, the longest-running independent newsprint journal concerning prisons and detention centers in the United States, along with publications focusing on prisoner rights issues." ECF No. 24 at PageID.212-213. Plaintiff also publishes a *Criminal Legal News* publication, sends books to prisoners, and "corresponds regularly with prisoners on constitutional issues and potential violations of their civil rights." *Id.* Defendant O'Bell Winn is the Warden of the Saginaw Correctional Facility, Bonita Hoffner was the Warden of Lakeland Correctional Facility from May 2012 to December 2017, Willie Smith was Warden of Ionia Correctional Facility from October 2002 to May 2018, and Carmen Palmer was Warden of Michigan Reformatory at times relevant for the case. ECF *Id.* at PageID.213-214. Defendant Does 1 through 30 "are or were employed by and are or were agents of MDOC when some or all of the challenged inmate mail policies and practices were adopted and/or implemented." *Id.* at PageID.215. Defendant Heidi Washington "is, and at all relevant times herein mentioned was, the

Director of MDOC, the state agency that manages the correctional facilities within the State of Michigan." *Id.* at PageID.213.

**A.**

In its amended complaint, Plaintiff explains that it "publishes and distributes a soft-cover monthly journal titled *Prison Legal News*, which contains news and analysis about prisons, jails, and other detention facilities, prisoners' rights, court rulings, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals. The monthly journal is published on newsprint and is 72-pages long." *Id.* at PageID.216. Plaintiff "also publishes and/or distributes approximately 40 different softcover books about the criminal justice system, legal reference books, and self-help books of interest to prisoners." *Id.* at PageID.216. There are three publications relevant to this suit—*Prison Legal News*, *Criminal Legal News*, and various books that HRDC publishes. Plaintiff has "46 subscribers to its monthly publication [Prison Legal News] within the MDOC" as of July 2019 with one to six subscribers at each of the following prisons: Baraga Correctional Facility, Bellamy Creek Correctional Facility, Carson City Correctional Facility, Central Michigan Correctional Facility, Chippewa Correctional Facility, Cooper Street Correctional Facility, Earnest C. Brooks Correctional Facility, G. Robert Cotton Correctional Facility, Richard A. Handlon Correctional Facility, Gus Harrison Correctional Facility, Ionia Correctional Facility, Lakeland Correctional Facility, Macomb Correctional Facility, Marquette Branch Prison, Michigan Reformatory, Muskegon Correctional Facility, Oaks Correctional Facility, Saginaw Correctional Facility, and the Women's Huron Valley Correctional Facility. *Id.* at PageID.217-218.

**B.**

Michigan Department of Corrections Policy Directive 05.03.118 governs the distribution of mail to prisoners. The relevant part of the 13-page policy states "Mail shall not be prohibited <u>solely</u> because its content is religious, philosophical, political, social, sexual, unpopular, or repugnant." Para. D. Books, magazines, and other similar publications are allowed only if ordered from an approved vendor or directly from the publisher, if it is mailed directly to the prisoner, or if it is from a correspondence school. Para. Z. The policy outlines prohibited mail, including "mail that may pose a threat to the security, good order, or discipline of the facility, facilitate or encourage criminal activity, or interfere with the rehabilitation of the prisoner." Para. NN.

If mail is received that violates the policy, it will be rejected. Para RR. If a prisoner has mail that has been rejected, a notice of rejection is sent to the prisoner and there is a multi-stage appeals process, including review by a hearings officer, the warden, and CFA Deputy Director. Paras. VV-DDD. The sender of the rejected mail also will be sent a copy of the rejection notice. Para. VV.

**C.**

In its complaint, Plaintiff alleges "Defendants have adopted and implemented mail policies and practices prohibiting delivery of written speech from HRDC while failing to provide due process notice of and an opportunity to challenge that censorship." ECF No. 1 at PageID.1. Plaintiff alleges it "engages in core protected speech and expressive conduct on matters of public concern, such as the operation of prison facilities, prison conditions, prisoner health and safety, and prisoners' rights." *Id.* at PageID.5. It "distribute[s] its monthly publication to prisoners and law librarians in more than 3,000 correctional facilities located across all 50 states, including the Federal Bureau of Prisons and MDOC." *Id.* at PageID.7. Plaintiff alleges "certain prisons within

the state of Michigan have withheld all or part of issues of [HRDC publications] . . . . [and] believes that at least one officer at each prison . . . had direct knowledge of and were directly involved in each and every instance of censorship." *Id.* at PageDI.9. Plaintiff claims "prison officials erroneously rejected issues of *Prison Legal News* and *Criminal Legal News*, on the grounds that content of the magazines' articles posed a threat to the security, good order, or discipline of the facility, facilitated or encouraged criminal activity, or interfered with the rehabilitation of prisoners" even though the publications "pose no threat to any legitimate penological interests." *Id.* at PageID.9. Plaintiff alleges 29 of 36 issues of *Prison Legal News* "were censored by at least one MDOC facility" and some books HRDC sent to prisoners were also rejected because "HRDC was not the publisher or authorized vendor." *Id.* Additionally, despite MDOC's policy stating otherwise, Plaintiff alleges "a majority of MDOC facilities have a custom and practice of failing to send the required notice" of rejection to the sender. *Id.* at PageID.10. Even if MDOC gives notice, it "does not provide a process to challenge censorship decisions" and "[i]n many cases [when HRDC appealed the rejection], the facility that censored the materials ignored the appeal." *Id.* at PageID.10. The rationale provided in the rejection notices HRDC did receive cited concerns about "the security, good order, or discipline of the facility" or concerns the material "may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner." *Id.* at PageID.11, 12, 15, 25. Books were also rejected because "the sender is not the publisher[] and is not an authorized vendor." *Id.* at PageID.12, 23.

## II.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor

and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted). The Sixth Circuit has held that "a conclusory legal interest" in forfeited property is insufficient to be successful against a motion to dismiss. *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014); *United States v. Akhtar*, 2018 WL 5883930 at *2 (6th Cir. Sept. 19, 2018).

## III.

Defendants seek to dismiss Plaintiff's alleged violations of the First Amendment and the due process clause against the four named wardens, Winn, Hoffner, Smith, and Palmer, 30 prison employee Does, and MDOC Director Washington in their individual capacities under Fed. R. Civ. Pro. 12(b)(6) on the basis of qualified immunity. ECF No. 22 at PageID.140-142. Defendants further seek to dismiss the due process claim against Defendant Washington in her official capacity under 12(b)(6) because, at most, her behavior was negligent "which is not actionable under the Due Process Clause" or because the due process claim is moot. *Id.* at PageID.141, PageID.157.

### A.

The caption of the original complaint stated that Defendant Winn was sued in his official capacity (ECF No. 1 at PageID.1), but the body of complaint indicated Defendant Winn was actually being sued in his individual capacity for monetary damages. ECF No. 1 at PageID.3 ("As

to all claims presented herein against him, Defendant Winn is being sued in his individual capacity for damages."). An individual sued in their individual capacity is being sued "for actions he takes under color of law," i.e., for actions Defendant Winn took during his job. *Baar v. Jefferson Cty. Bd. Of Educ.*, 476 Fed. Appx. 621, 634 (6th Cir. 2012) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). In comparison, "[o]fficial capacity suits . . . 'generally represent . . . another way of pleading an action against an entity of which an officer is an agent,'" i.e., MDOC. *Baar v. Jefferson Cty. Bd. Of Educ.*, 476 Fed. Appx. 621, 634 (6th Cir. 2012) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Damages for individual capacity suits are recouped from the defendant, but in an official capacity suit, any relief must come from the entity itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Defendants argue any potential suit against Defendant Winn in his official capacity is barred by the Eleventh Amendment. ECF No. 22 at PageID.155-157. Plaintiff does not address the issue in its response, but filed an amended complaint changing the caption of the complaint to clarify that Defendant Winn is being sued in his individual capacity. ECF No. 24 at PageID.211. Defendants included a footnote in their reply explaining the history of confusion over the suit against Defendant Winn and state "[i]t is agreed Def.'s motion to dismiss shall relate to the Pl.'s amended complaint and Def. Winn also seeks dismissal for all claims against him in his individual capacity." ECF No. 30 at PageID.303. As such, Defendants argument that the suit against Defendant Winn is barred by the Eleventh Amendment will be disregarded and Defendant Winn will be considered as a Defendant who seeks to dismiss the First Amendment and due process claims based on qualified immunity in III.B.

**B.**

Defendant Wardens Winn,[1] Hoffner, Smith, and Palmer, Director Washington, and 30 Does have been sued in their individual capacity for monetary damages on both the First Amendment and due process claims. ECF No. 24 at PageID.242-244. Defendants argue they are eligible for qualified immunity on both claims.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is an objective standard. *Ohio Civil Service Employees Association v. Seiter*, 858 F.2d 1171, 1173 (6th Cir. 1988). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id.* at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093

---

[1] See supra Section III.a for explanation of why Defendant Winn is included here.

(2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* The Sixth Circuit has emphasized the proper order to analyze a qualified immunity claim is to determine if "the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred," second, if the violation was of "a clearly established constitutional right of which a reasonable person would have known," and third, if "plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right.'" *Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Circuit 2009). However, the Supreme Court has held this order is not mandatory. *Id.*

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

In *Lyons v. City of Xenia*, the Sixth Circuit explains that for a constitutional right to be clearly established, the officers must be on notice of conduct that would violate a plaintiff's rights. There are two ways a plaintiff can demonstrate an officer was on notice of the constitutional right—"the violation was sufficiently 'obvious' under the general standards of constitutional care that the plaintiff need not show 'a body' of 'materially similar' case law" or "where the violation is shown by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s]

the case." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 599–600 (2004)).

**i.**

Defendants first allege entitlement to qualified immunity on the First Amendment claim. Whether there is a clearly established constitutional right will be addressed first. Second, the facts will be evaluated to determine if there is a violation of an alleged clearly established constitutional right.

**a.**

"To determine whether a right is 'clearly established,' we must first look to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and courts within this Circuit, and last to decisions of other circuits." *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2016). The standard for review of prison policies challenged by the First Amendment "is whether the regulations are 'reasonably related to legitimate penological interest.'" *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This standard applies to both the prisoners and third parties trying to contact the prisoners. *Id.* When evaluating prison regulations, the Supreme Court is clear that "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution . . . . Because prisoners retain these rights, '[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'" *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)). However, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). "Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85.

Even though case law focuses on prisoners rights, the same deference granted to prison officials when determining if a prisoner's First Amendment rights have been violated also applies to publisher's rights to contact or communicate with a prisoner. The Supreme Court articulated four factors to determine

> whether a prison's restriction on incoming publications was reasonably related to legitimate penological interests: "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (quoting *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (citing *Turner*, 482 U.S. at 89))).

If the restriction or practice was reasonably related to legitimate prison concerns, there is no violation of the First Amendment.

Addressing the first factor, a reasonable prison official could conclude that there is a rational connection between the denials of the HRDC publications and the security at the prison. For example, a prison warden who has concerns that certain individuals who might seek to escape might seek information about prisoners seeking to escape from other prisons. Or a prison warden may be concerned that an article that alleges Michigan prisons are poisoning prisoners may incite violence, thereby potentially harming the guards and other inmates in the prison. Security concerns are likely similar at most prisons, but not identical. On the second factor, the MDOC makes a prison by prison determination. This allows more prisoners to receive the publications than an outright ban of all HRDC publications. If prison staff were required to be more uniform in their rejections, then anytime one facility has concerns with an HRDC publication, prisoners at other facilities would not receive the issue. Or, if prison staff were required to distribute every issue,

there could be a particularly inflammatory article about a specific prison that could lead to unrest and security concerns at the highlighted prison, potentially causing harm to guards and inmates.

In addition, MDOC policy articulates a review process for prisoners and senders of mail to challenge a rejection. The third factor focuses on the effect of fully accommodating prisoners First Amendment rights on the safety of guards and other inmates. In this case, there could be security concerns with the material. Most of HRDCs publications are allowed in most Michigan prisons because the information is not considered a security threat. However, as mentioned earlier, there may be specific topics more likely to cause security concerns than others. The prison warden is in the best position to evaluate what topics are likely to cause security risks, not a Court. Plaintiff even alleges that most of the rejection notices it received from MDOC facilities explained that the reason the publication was rejected was attributable to security concerns. If a warden is concerned that material may cause a riot or disruption, he does not have to wait until problems emerge. *See Murchison v. Rogers*, 779 F.3d 882, 890 (8th Cir. 2015); *Lawson v. Singletary*, 85 F.3d 502, 512 n.15 (11th Cir. 1996). Concerns for safety and security are real and could have a significant impact on the prison. The fourth factor explores the question of whether there are easy alternatives to the current procedure. The only alternative to the current prison by prison determination is an outright ban which would be more restrictive than the current policy or full disclosure which provides no deference to prison officials.

In addition, the two procedures for Defendants to be placed on notice that their conduct violates Plaintiff's rights are not satisfied. The first criteria is "where the violation was sufficiently 'obvious under the general standards of constitutional care . . . the plaintiff need not show 'a body' of 'materially similar' case law." *Lyons*, 417 F.3d at 579. Here the violation was not sufficiently obvious. The Supreme Court has held that "there is no question that publishers who wish to

communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). However, the Sixth Circuit has also explained that prisoners right to receive mail is "subject to restriction in the interests of prison security" as long as the restrictions "further legitimate penological objectives, in a manner no more restrictive than necessary." *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985). While First Amendment cases provide that defendants cannot arbitrarily prohibit prisoners from receiving mail, the case law also provides that deference should be provided to prison officials to "further legitimate penological objectives." *Id.* The deference outlined in case law is simply too discretionary for Defendants to be placed on notice that their behavior violated a clearly established constitutional right.

The second criteria is "failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case.'" *Lyons*, 417 F.3d at 579. Just as the case law is not sufficiently concrete for employees to be aware of an obvious violation of a prisoner's First Amendment rights, the contours of the law and the discretion provided to prison officials lacks sufficient clarity for employees to be on notice of "particularized" legal precedent. Additionally, Defendants alleged actions were in line with the current case law precedent. Instead of forwarding all HRDC publications (which Defendants argue could decrease prison safety) or denying all HRDC publications (which would violate prisoner's First Amendment rights), employees evaluated each issue of *Prison Legal News* at each prison every month. The result as alleged by Plaintiff may appear arbitrary, but Plaintiff has not asserted any action on the part of any MDOC employee where the employee inappropriately or inaccurately claimed prison security was at risk when in fact it was not. There is sufficient deference in the standard and the individualized nature of the review of mail that it cannot be said that Defendants failed to adhere to the case precedent. In fact,

based on Plaintiff's alleged data, when MDOC employees mailed rejection notices to HRDC, all the notices claimed *Prison Legal News* was rejected due to security concerns generally or potential criminal activity. Based on Plaintiff's allegations, it appears Defendants reviewed each issue of *Prison Legal News* individually at each prison. The statistics proffered by Plaintiff do not indicate any sort of coordination between prisons. Therefore, if prison employees did reject or accept mail on a month by month basis, their behavior conforms with the current case law framework of providing prisoners access to mail while rejecting any items that could create a security concern. Again, this process is better aligned with current precedent than an out-right ban on the materials.

In summary, the case law demonstrates that prisoners and publishers have a First Amendment right to specific material that is sent from a publisher to a prisoner. However, significant deference is extended to prison officials when determining what publications should be rejected and what should be allowed to be sent to the prisoner. The contours of the case law is intentionally too deferential to prison officials and for a prison worker, warden, or MDOC director to be on sufficient notice of a clearly established constitutional right in order to violate it. Plaintiff's First Amendment right is not clearly established because of the discretion extended to prison officials to determine what mail is permitted in prisons. Therefore, Defendants could not have known they were violating a clearly established constitutional right when deciding which issues of *Prison Legal News* and other HRDC publications to allow admittance into the prison and which ones to prohibit.

**b.**

Even if there were a clearly established constitutional right, the facts do not support the assertion that Defendants violated that right. Once Defendants asserted a qualified immunity defense, Plaintiff has the burden of alleging sufficient facts to demonstrate that a reasonable person

would have known that they were violating clearly established constitutional law. Defendants argue that even if there were a violation of established constitutional right, Defendants are still eligible for qualified immunity because case law provides that 1) "security is the most important issue in a prison," 2) "prison officials' judgment as to prison safety and security is entitled to deference," and 3) "some level of inconsistency in review is tolerable" considering the amount of mail Defendants process daily. ECF No. 22 at PageID.165. Plaintiff responds that Defendants' focus on security is without merit because "Defendants' censorship is inconsistent and haphazard." ECF No. 29 at PageID.275. For example, three facilities rejected the May 2019 issue of *Prison Legal News* while the other Michigan prisons accepted the publication. ECF No. 29 at PageID.275. Plaintiff also alleged Defendants "censored HRDC's magazines based on articles about medical problems at the Women's Huron Valley Correctional Facility, problems with private companies that contracted to provide food services at MDOC prisons, [] indeed virtually any article that mentions an MDOC prisoner or employee" and "a Vermont prisoner who happened to be at a non-MDOC facility in Michigan." ECF No. 29 at PageID.277-278 (footnotes omitted). Plaintiff further argues "prisons throughout the United States, including other MDOC facilitates, deliver HRDC's publications without adverse consequences. There is no reason to give more deference to the judgment of MDOC officials who censor HRDC's publications than to those who allow prisoners to receive them." ECF No. 29 at PageID.278.

The Supreme Court has held the standard of review for prisoner constitutional questions is rational basis review. It has also concluded that deference should be granted to prison officials due to the security concerns they encounter daily. MDOC's policy includes opportunities for individual review and an appeal process including a hearing officer, the prison warden, and the CFA Deputy Director. ECF No. 22 at PageID.153-154. As Defendants discuss in their reply, "there is no one

size fits all solution" to regulating prisons. ECF No. 30 at PageID.304. Plaintiff does not meet its burden to show Defendants qualified immunity defense should not apply on the First Amendment claim. The First Amendment claim for monetary damages against Defendants Winn, Washington, Hoffner, Smith, Palmer, and Does 1-30 will be dismissed.

**ii.**

Plaintiff's second argument is that Defendants violated its right to due process under the Fourteenth Amendment. ECF No. 24 at PageID.243. The same qualified immunity framework discussed supra[2] applies to the due process claim, including the burden on Plaintiff to provide sufficient facts to override Defendants qualified immunity defense. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). There are three minimal due process safeguards that are required for censorship of prisoner mail, first "notice of rejection [must] be given to the inmate-recipient." *Martin v. Kelley*, 803 F.2d 236, 243 (6th Cir. 1986). Second, there must be "an opportunity to protest the decision" to reject the mail. *Id.* at 243–44. Third, there must be an opportunity to appeal the "rejection decision to an impartial third party prior to the letter being returned." *Id.* at 244. Assuming without deciding that Plaintiff had a clearly established constitutional right to notice, there is insufficient evidence of a pattern of behavior by Defendants that they were knowingly violating Plaintiff's constitutional right to due process.

Plaintiff alleges in its complaint that some facilities always provided a notice of rejection, others sometimes provided notice, and a few never provided notice at all. *See* ECF No. 24 at PageID.219-242. Plaintiff also alleges even when it received notice, it was frequently too broad to challenge the rejection. *Id.* at PageID.220-242. Plaintiff explains there are about seven prisons where it believes the prisoner subscriber did not receive HRDC mail, but HRDC was never sent a

---

[2] *See* Section III.B.

rejection letter.[3] In the remainder of the prisons listed in HRDC's complaint, HRDC received at least one notice of rejection when a publication was rejected.

Defendants argue that "ordinary negligence [on the part of any or all defendants] does not rise to the level of a due-process violation." ECF No. 22 at PageID.174. For the named wardens specifically, Defendants allege "Plaintiff has not shown that they have failed to participate in the process of re-review of the decisions of hearing officers." ECF No. 22 at PageID.174. Therefore Defendants argue they are entitled to qualified immunity.

Plaintiff is correct that it has a right to receive notice of mail that was rejected by the prison. *See Martin v. Kelley*, 803 F.2d 236, 244 (6th Cir. 1986). Plaintiff argues that notice is essential for the prisoner or the sender to be aware of the rejection and to challenge the decision, if they so desire. ECF No. 29 at PageID.273. This is also true. However, Plaintiff cannot make the leap from lack of notice from some prisons to an intentional violation of a constitutional right. Plaintiff makes three arguments in response to Defendants' claim for qualified immunity, none of which are persuasive.

Plaintiff first argues that negligence cannot be used to defend an employee's failure to comply with MDOC policy. ECF No. 29 at PageID.274. This unsupported argument does not hold water. An employee may reject the publication but the notice may be lost in the mailroom, a worker may forget to mail the notice like in *Dale E. Frankfurth, D.D.S. v. City of Detroit*, or it simply could have been lost in the mail. 1987 WL 44769 (6th Cir. Sept. 17, 1987). This is likely when

---

[3] It is not entirely clear from Plaintiff's amended complaint how many times HRDC did not receive notice of the rejection versus times when the publication was rejected, but HRDC properly received notice. There is more specific information in Plaintiff's motion for preliminary injunction on this issue, but it is not discussed here because of the standard of review for a motion to dismiss. As such, the decision is based on the facts alleged in the complaint only.

"mailroom staff at MDOC's 31 facilities . . . process hundreds of pieces of mail each day." ECF No. 22 at PageID.172.

Second, Plaintiff argues that unlike in *Frankfurth* where the Court found one clerk's single mistake to be negligent, here there is an allegation of systematic efforts by MDOC and prison wardens to fail to mail rejection notices. ECF NO. 29 at PageID.274. While it is clear that Plaintiff alleges about sixty pieces of mail were rejected without notice and multiple mail clerks and wardens are involved, there is no pattern identifiable from the face of the complaint of one prison routinely rejecting publications from HRDC. MDOC has over 39,000 prisoners. Plaintiffs allege 120 issues of *Prison Legal News* were rejected over three years at 22 different MDOC facilities. Plaintiffs allege they did not receive rejections for about 60 of the rejected issues. At most, it appears the Harrison prison allegedly rejected *Prison Legal News* 12 times within three years with no notice to HRDC. ECF No. 24 at PageID.230. The 60 times HRDC allegedly did not receive notice of the rejection can be considered negligence on the part of the prison officials and not an intentional deprivation of HRDC's due process rights. There is no indication any prison had a policy where senders would not receive notice of rejection. Plaintiff's three sentence argument that this was habit and not one-off negligence is insufficient to meet its burden to overcome Defendants' qualified immunity defense.

Plaintiff's third argument is that Defendants cannot argue both that security concerns prevented the publications from being given to prisoners (First Amendment claim) and argue negligence for lack of notice (due process claim) to Plaintiff. ECF No. 29 at PageID.274-275. However, these two considerations are not inherently in conflict. In fact, it is quite possible for an employee to make an intentional decision to reject a publication, maybe even create and send the rejection notice to the prisoner, but fail to complete the process to send the rejection notice to

Plaintiff. Plaintiff has not presented evidence that Defendants intentionally violated Plaintiff's due process rights in order to lose their entitlement to qualified immunity. Defendants motion to dismiss the individual damage claims against Defendants Winn, Washington, Hoffner, Smith, Palmer, and Does 1-30, on the due process claim due to qualified immunity will be granted.

**C.**

Next, Plaintiff argues that Defendant Washington in her official capacity violated Plaintiff's right to due process under the Fourteenth Amendment and seeks injunctive relief. ECF No. 24 at PageID.243.

**i.**

In Defendants' motion to dismiss, they allege that "[t]he injunctive-relief, due-process claim against Director Washington should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because, at most, any failure to follow MDOC's mail policy directive 0.5.03.118 [sic] is negligence, which is not actionable under the Due Process Clause." ECF No. 22 at PageID.141. However, Defendants do not address this argument in their brief. Instead Defendants seem to abandon the argument contending that the injunctive relief claim against Defendant Washington is moot due to an email she sent out to all prison wardens reminding and emphasizing MDOC's policy. ECF No. 22 at PageID.157-161. Because Defendants do not expand upon their argument that the injunctive relief due process claim should be dismissed for failure to state a claim, it will be denied.

**ii.**

**a.**

Turning next to the mootness argument, Defendants argue the due process claim regarding injunctive relief against Defendant Washington is moot. ECF No. 22 at PageID.157. A case

becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Usually, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." *Davis*, 440 U.S. at 631 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)). The burden on Defendants to demonstrate "mootness 'is a heavy one.'" *Davis*, 440 U.S. at 361 (quoting *W.T. Grant Co.*, 345 U.S. at 6333). However, "the burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). The government's "self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine." *Speech First, Inc.*, 939 F.3d at 767 (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012)). The Court "presume[s] that the same allegedly wrongful conduct by the government is unlikely to recur." *Speech First, Inc.*, 939 F.3d at 767. However, "[w]hile all governmental action receives some solicitude, not all action enjoys the same degree of solicitude. . . . [The Court] takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First, Inc.*, 939 F.3d at 767.

> Where the government voluntarily ceases its actions by enacting new legislation or repealing the challenged legislation, that change will presumptively moot the case unless there are clear contraindications that the change is not genuine.
> On the other hand, where a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions.
> If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim.
> Where regulatory changes are effected through formal, legislative-like procedures, we have found that to moot the case the government need not do much

more than simply represent that it would not return to the challenged policies. *Speech First, Inc.*, 939 F.3d at 768–69 (citations omitted).

**b.**

In *Speech First, Inc.*, the University of Michigan President and other senior officials changed the definitions of the terms "harassing" and 'bullying" from the Office of Student Conflict Resolution's website after the plaintiff filed the complaint regarding the vagueness of the definitions. *Speech First, Inc.*, 939 F.3d at 761–62, 769. However, there was no evidence presented of any formal process used to change the definitions in question nor had the school "affirmatively stated that it does not intend to reenact the challenged definitions." *Speech First, Inc.*, 939 F.3d at 769. In the case at hand, Defendant Washington "formally reminded all its 31 facilities that they should have—and follow—detailed operating procedures for incoming mail, consistent with MDOC Policy Directive 05.03.118 and Statewide Operating procedure 05.03.118A." ECF No. 22 at PageID.159-160. Defendant Washington claims she is "entitled to solicitude as [a] government official[], and especially since this communication is consistent with already existing MDOC policy 05.03.118, it is unlikely that [she] will turn around and issue a contrary directive. Moreover, she has given facilities a date certain by which they must check, and if necessary, amend their operating procedures." ECF No. 22 at PageID.160.

While government officials are entitled to solicitude when responding to a lawsuit, Director Washington has not changed her department's standards in order to satisfy even the lower standard for governmental mootness. As admitted by Defendants, Director Washington can reverse direction and issue a contrary directive. The likelihood of her amending her directive to encourage prison officers to stop complying with the policy is likely low. However, when Defendants state "it is unlikely that she will turn around and issue a contrary directive" in their motion to dismiss, they are essentially admitting she has the ability to issue a counter-directive in the future. ECF No.

22 at PageID.160. Defendant Washington has not substantiated that there is an institutional process to ensure she does not amend the policy in the future. Second, Defendant Washington has only reminded her employees to follow the current policy. She is aware that Plaintiffs are challenging the enforcement of the policy and not the policy itself (see ECF No. 22 at PageID.160). However, she does not provide evidence of any specific mechanism she intends to use to ensure the prisons will enforce the current policy going forward besides one friendly reminder email. Consequently Plaintiff's claim for injunctive relief against Defendant Washington for violation of due process is not moot and will survive Defendants' 12(b)(6) motion.

### D.

One form of relief Plaintiff seeks is a declaratory judgment "that Defendants' policies and practices violate the Constitution." ECF No. 24 at PageID.244. 28 U.S.C. 2201 provides

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Plaintiff did not assert a claim for declaratory judgment in its complaint or amended complaint. ECF Nos. 1, 24. It only listed its request for a declaratory judgment in its request for relief at the end of the complaint. There is no live claim for declaratory judgment by Plaintiff. Defendants' request to deny Plaintiff's request for declaratory judgment is untimely at this stage in the proceedings and will be denied.

### IV.

Plaintiff brought First Amendment and due process claims against 35 Defendants in their individual capacities, which will be dismissed. The two remaining claims are for injunctive relief against Defendant MDOC Director Washington in her official capacity for violations of its First

Amendment and due process rights. As such, the analysis on the preliminary injunction will be limited to these two claims.

A.

Generally, in determining whether to grant injunctive relief, a court must examine and weigh four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington–Fayette Urban Cty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002); *McPherson v. Mich. High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet,* 305 F.3d at 573.

Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate. Thus, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000); *Mich. State AFL–CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed."). This is especially true in First Amendment cases where "the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).

Plaintiff bears the burden of demonstrating its entitlement to a preliminary injunction, and its burden is a heavy one. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly

demand it." *Overstreet,* 305 F.3d at 573. "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000). Thus, plaintiffs may not merely point to genuine issues of material fact which exist, but must affirmatively demonstrate their entitlement to injunctive relief.

**B.**

Plaintiff seeks a preliminary injunction as to both the First Amendment and due process claims. Each will be discussed in turn.

**i.**

Plaintiff analyzes *Turner's* four factors contending that Defendant Washington violated the First Amendment, thereby demonstrating that it is likely to prevail on the merits of the case, and as such, meets the first *Overstreet* factor for a preliminary injunction. ECF No. 3 at PageID.58. Plaintiff argues the censorship of HRDC publications "bears no rational relation to legitimate penological objectives" and therefore Defendants behavior is unconstitutional. ECF No. 3 at PageID.58. To bolster its claim, Plaintiff explains that monthly *Prison Legal News* issues are accepted at some facilities and rejected by others without any logical explanation for why some facilities reject the publication and others allow prisoners to receive the mail. ECF No. 3 at PageID.60. Plaintiff also alleges that the rejected mail will be helpful to rehabilitate prisoners and prepare them for life after incarceration. ECF No. 3 at PageID.61. While it is true that "Turner requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective," Defendant Washington responded by providing an example of one issue that was rejected by some prisons. The June 2017 edition (that was rejected by 11 facilities) includes quotes that says Parnall Correctional Facility has "been poisoning prisoners," compares

it to a gas chamber, and alleges "MDOC 'disregards' prisoner complaints." ECF No. 23 at PageID.194. The rationale for each rejection is unknown, but Plaintiff's bare allegation that the censorship "bears no rational relation to legitimate penological objectives" alone is insufficient to establish a likely constitutional violation. Additionally, Plaintiff does not explain what positive and productive articles prisoners are being denied as a result of the censorship.

Addressing the second *Turner* factor, Plaintiff alleges Defendant Washington failed to provide alternate means for HRDC to exercise their First Amendment rights. ECF No. 3 at PageID.63. HRDC claims it does not have the resources to reach out to prisoners individually via phone calls or prepare television programs as an alternative to the written publication. Defendant Washington counters by explaining that not every issue is rejected and HRDC can communicate with prisoners with non-rejected publications. Also, the Sixth Circuit has explained that alternative means of communication do not have to convey the same message to the same prisoner as the rejected communication. *See Thornburgh v. Abbott*, 490 U.S. 401, 417–18 (1989).

Plaintiff continues to the third *Turner* factor stating accommodating HRDC's First Amendment right by not rejecting publications would not cause an additional burden to prisons because the prison workers could just as easily give the publication to the prisoner rather than rejecting it. ECF No. 3 at PageID.65. Plaintiff claims it "is not aware of any state or federal prison where its publications have created a security problem" and therefore, Michigan prisons should follow suit. Defendant Washington focuses on the potential security concerns and her anticipation "that prisoners might dodge prison rules and that certain publications might foster that behavior." ECF No. 23 at PageID.200. Plaintiff's statement that no other prison has had security concerns because of *Prison Legal News* does not mean the same is true in Michigan—especially when a publication compares an MDOC facility to a gas chamber.

The fourth *Turner* factor focuses on the question of whether the regulation exaggerates the necessary response from the prison. Plaintiff argues that because other prisons operate without problems and distribute *Prison Legal News* and other HRDC publications outside of Michigan, the same would be true in Michigan. ECF No. 3 at PageID.66. Defendant Washington responds that there are no less strict responses available to ensure the publication reaches as many prisoners as possible without creating security concerns. This is true. MDOC does not restrict all HRDC publications or even certain issues from all prisons. Instead, each prison makes its own determination if that month's publication will be rejected—thereby ensuring the greatest number of prisoners receive the publication. In this case, with the facts as currently presented, it is not likely Plaintiff will prevail on its First Amendment claim.

While there are four factors to determine if a motion for preliminary injunction should be granted, the likelihood of prevailing on the merits of the case is frequently the determinative factor. *See Jones*, 569 F.3d at 265. The second preliminary injunction factor is if the moving party, Plaintiff, will suffer irreparable harm if the preliminary injunction is not issued. Plaintiff may still mail publications to prisoners in Michigan and object when a publication is rejected according to the policy. Therefore, Plaintiff may have to object and seek review of rejected publications, but there will not be irreparable harm. Factor three also favors denying the preliminary injunction. Courts are to give deference to prison officials' determination of safety in prisons. At this point, Defendant Washington has demonstrated legitimate security concerns with some HRDC articles if this Court were to require all *Prison Legal News* issues to be delivered to their recipients. Factor four asks if the public interest would be served by an injunction. HRDC would benefit, but no other person would benefit from the injunction. Taking all four factors together, Plaintiff has not met its burden to obtain a preliminary injunction on the First Amendment claim.

**ii.**

Plaintiff also seeks a preliminary injunction on its due process claim. Plaintiff rightfully asserts it is entitled to notice of a rejected publication. ECF No. 3 at PageID.67-69. Plaintiff's ability to challenge rejections is diminished when it does not receive notice of the rejection or the reason for the rejection. However, Plaintiff cannot show that it is likely to prevail on the merits of the due process claim by simply outlining the law and alleging that other prisons require notification for rejected mail without any security consequences. Plaintiff explains the Federal Bureau of Prisons has a notification policy that has been upheld in the Courts. However, Plaintiff does not challenge MDOC's policy and so the analogy to the federal Bureau of Prisons' policy is irrelevant to the determination of whether MDOC's actions violates Plaintiff's due process rights. Defendant Washington explains that MDOC's policy is to provide notice to senders when mail is rejected and that some negligence on the part of Defendant Washington or her staff is not actionable under the due process clause. It is unknown if Defendant Washington's behavior of not adequately enforcing the notification policy is intentional or negligent, but Plaintiff has alleged insufficient facts to show it is likely to prevail on the merits of the due process claim. The first *Overstreet* preliminary injunction factor favors Defendant Washington.

The second factor in a preliminary injunction analysis is irreparable harm. In this case, Plaintiff will suffer irreparable harm, the inability to challenge rejection decisions, if it does not receive notice each time an issue from a prisoner's subscription to an HRDC publication or an HRDC book is rejected. To date, Plaintiff alleges it has not received notice of about half of the over 120 rejections of its publications in three years. To counter Plaintiff's concerns, Defendant Washington has responded by reminding all prisons to follow MDOC policy, which includes

sending notice to senders of rejected mail. Without knowledge of the effect of Defendant Washington's reminder though, this factor favors Plaintiff.

The third factor to be examined when a preliminary injunction is requested is whether the injunction would harm others. Plaintiff alleges there would be minimal injury to Defendant Washington or her staff if they are required to send notice of rejections because the current practice does not provide Plaintiff with sufficient information to challenge the alleged rejections of the publication. Unlike the First Amendment claim where a preliminary injunction could potentially cause harm to prison staff and other prisoners, here there would no harm to Defendant if the injunction required all prisons to follow the policy and send notifications to senders whose mail was rejected. The third factor weighs in favor of Plaintiff.

The fourth factor inquires whether the preliminary injunction will serve the public interest. Plaintiff argues the notice ensures its First Amendment rights are being protected. Without notice, it cannot challenge any potential violations. If the same problem has been occurring with other senders, notice would serve the public interest by ensuring all senders of prison mail receive notice of rejections. Even if this behavior only occurs with Plaintiff, there is no harm to the public interest by issuing an injunction. Therefore, the fourth factor favors Plaintiff.

Despite the second, third, and fourth factors favoring Plaintiff, Plaintiff has not demonstrated that it is likely, on the facts as they currently stand, that it will prevail on the merits of the First Amendment and due process claims for injunctive relief. Accordingly, Plaintiff's motion for preliminary injunction will be denied.

## V.

Accordingly, it is hereby **ORDERED** that Defendants' Motion to Dismiss, ECF No. 22, is **GRANTED IN PART** and **DENIED IN PART**. The First Amendment and due process claims

against Defendants Winn, Hoffner, Smith, Palmer, Washington, and the 30 Does in their individual capacities are **DISMISSED WITH PREJUDICE**. Plaintiff's First Amendment and due process claim for injunctive relief against Defendant Washington in her official capacity remain.

It is further **ORDERED** that Plaintiff's Motion for Preliminary Injunction, ECF No. 3, is **DENIED**.

Dated: January 6, 2020

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge