UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HUMAN RIGHTS DEFENSE CENTER,

      Plaintiff,

v.

HEIDI WASHINGTON,

      Defendant.

_____/

Case No. 1:19-cv-12470
Honorable Thomas L. Ludington

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

On August 22, 2019, Plaintiff Human Rights Defense Center ("HRDC") filed a complaint

against Defendants Prison Wardens O'Bell Winn, Bonita Hoffner, Willie Smith, and Carmen

Palmer, 30 unnamed prison employee Does, and Michigan Department of Corrections ("MDOC")

Director Heidi Washington. ECF No. 1. Plaintiff is a publisher of magazines and materials, such

as *Prison Legal News* for inmates about "prisons, jails, and other detention facilities, prisoners'

rights, court rulings, management of prison facilities, prison conditions, and other matters

pertaining to the rights and/or interests of incarcerated individuals." *Id.* at PageID.6. Plaintiff

alleges that Defendants censored and withheld its publications to prisoners in Michigan, violating

the First Amendment (Count I) and the due process clause from the Fourteenth Amendment (Count

II). *Id.* at PageID.32–34; ECF No. 24 at PageID. 242–44. Plaintiff sought monetary damages

against all Defendants in their individual capacities on the First Amendment and due process

claims. Plaintiff also sought injunctive relief against Director Washington in her official capacity

on both claims and a declaratory judgment that MDOC violated the Constitution.

On January 6, 2020, Defendants' motion to dismiss was granted in part and denied in part. ECF No. 32. The sole remaining claims are the First and Fourteenth Amendment claims for injunctive relief against Defendant Heidi Washington. ECF No. 32. After discovery, the parties filled cross-motions for summary judgment. Response and reply briefs were timely filed. ECF Nos. 57, 58, 62, 63, 64, 65.

## I.

### A.

HRDC Executive Director Paul Wright describes HRDC as "a nonprofit organization that advocates for progressive criminal justice reform and [] primarily focus[es] on prisoner rights advocacy, [] on conditions of confinement and how people are treated in prisons and jails, as well as the negative impacts of incarceration." ECF No. 58-2 at PageID.923. Its "main forms of advocacy are . . . two magazines, . . . media work, litigation, and . . . public speaking and media appearances." *Id.* at PageID.923. The Criminal Legal News ("CLN") magazine focuses on criminal law and procedure while the Prison Legal News ("PLN") magazine emphasizes civil litigation. *Id.* at PageID.928. HRDC has 15 to 17 employees. *Id.* at PageID.949. About 7,000 people subscribe to PLN and 2,000 people subscribe to CLN. *Id.* About 70% of PLN subscribers are incarcerated. *Id.* at PageID.950. The four main topics covered by PLN are medical care, mental health, excessive force, and sexual assault complaints by prisoners. *Id.* PageID.954. Paul Wright testified that PLN "give[s] people information that they can use to advocate for themselves and to help themselves. It's also a means of letting people know what's happening." *Id.* at PageID.971.

Inmates frequently write articles for the magazines and are considered "contributing writers." *Id.* at PageID.928. PLN authors are compensated, $10 per article under 1500 words, $50 per article over 1500 words, and a sliding payment scale for special projects. *Id.* at PageID.931.

Starting in 2016, HRDC noticed that MDOC was censoring more articles and publications than before. *Id.* at PageID.962–63. The instant lawsuit was filed in August 2019.

**B.**

Generally, the individual MDOC facilities train mailroom clerks. ECF No. 58-6 at PageID.1026–27, 1047–48. However, MDOC provides periodic training for mailroom clerks when large policy changes occur. *Id.* at PageID.1025.

The relevant section of MDOC's mail policy provides,

NN. Prisoners are prohibited from receiving mail that may pose a threat to the security, good order, or discipline of the facility, facilitate or encourage criminal activity, or interfere with the rehabilitation of the prisoner. The following pose such risks under all circumstances and therefore shall be rejected:

1. Mail containing specific information regarding the manufacture, or operation of electronic security systems, weapons, explosives, ammunition, or incendiary devices.

2. Mail depicting or describing procedures for manufacturing poisons, alcohol, or controlled substances.

3. Mail violating, advocating, or promoting the violation of state or federal laws. This includes mail advocating or promoting the filing of a false or fraudulent Uniform Commercial Code (UCC) financing statement in violation of MCL 440.9501.

4. Mail advocating or promoting violence, group disruption, or insurrection.

5. Mail describing or depicting acts of sadism, masochism, bondage, necrophilia, or bestiality, or describing, depicting, or appearing to promote sexual acts involving children. This does not include small advertisements in a publication sent directly from the publisher or an authorized vendor except if the advertisement depicts or appears to promote sexual acts involving children.

6. Mail advocating racial supremacy or ethnic purity or attacking a racial or ethnic group, which is reasonably likely to promote or cause violence or group disruption in the facility.

7. Mail providing detailed instruction in the martial arts, such as judo, karate, aikido, kendu, kung fu, and similar techniques.

8. Subject to Paragraph Z, a book, magazine, newspaper, or other publication that is not received directly from the publisher, an Internet vendor identified on Attachment A, a vendor identified on Attachment B, or, if the prisoner is approved to take a correspondence course pursuant to PD 05.02.119 "Correspondence Courses," directly from the approved correspondence school. This does not apply to an article or a few pages, or copies of a few pages, from a publication that may be included with a letter or other mail, unless it is reasonably believed to be an

attempt to circumvent this restriction. Retail and wholesale catalogs are specifically addressed in Paragraph AA.

9. A used publication.

10. A publication received on a credit basis (e.g., from a book club). This does not apply If the publication is completely pre-paid and receipt does not obligate the prisoner to make future credit purchases.

11. Mail containing, or encouraging or providing instruction in, the commission of criminal activity. This includes mail encouraging or providing instruction in the filing of a false or fraudulent UCC lien.

12. Mail containing a provocative or scurrilous attack on any religion or religious group. This does not include a thoughtful and rational discussion of religious beliefs or differences between religions.

13. Nude photographs, except if included in a publication sent directly from the publisher or an authorized vendor. Nude photographs are defined as any photograph exposing the buttocks (including photographs of an individual wearing a thong with the buttocks visible), pubic area or genitalia, or, except if a baby or infant, the female breast below the top of the areola. This includes exposure through "see through" materials.

14. Photographs depicting actual or simulated sexual acts by one or more persons. This includes photographs in a publication sent directly from the publisher or a vendor authorized by the facility.

15. Non-commercially produced greeting cards; commercially produced greeting cards made of non-standard card stock paper or which have embellishments, are multi-fold, or exceed 6"x8" in size.

16. Official photographs of a victim at a crime scene or depicting injuries to a victim sustained as a result of a crime that were taken for purposes of criminal investigation or prosecution. This includes photographs of the autopsy of a victim.

17. Mail depicting, encouraging, or describing methods of escape from a correctional facility. This includes blueprints, drawings, or similarly detailed descriptions of correctional facilities, courthouses and medical care facilities, and detailed roadmaps of Michigan, any state contiguous to Michigan, or the Province of Ontario, Canada.

18. Mail written in code, or in a foreign language which cannot be screened by institutional staff to the extent necessary to conduct an effective search. However, correspondence written in a foreign language shall be processed as set forth in paragraphs SS through UU of this policy.

19. Mail that is known to contain personal information about an employee or an employee's family, unless it is sent by the employee and the employee is related to the prisoner by blood or marriage, or is provided with the approval of the Administrator of the Office of Legal Affairs or designee regarding pending litigation. This includes personal information published in newspapers.

20. Mail for the purpose of operating a business enterprise while within the facility. This does not apply to mail regarding the operation of a business enterprise after release.

21. Mail that is restricted or prohibited under a court order (e.g., personal protection order).

22. Mail violating postal regulations.

23. Mail containing threats.

ECF No. 57-2 at PageID.708–10. If the facility determines that the prisoner should not receive the

mail, the following occurs:

VV. Whenever mail addressed to a prisoner is opened and believed to be in violation of policy, a Notice of Package/Mail Rejection (CSJ-316) shall be completed and promptly sent to the prisoner, except as set forth in Paragraph F. The Notice shall identify the specific item believed to be in violation of this policy and why the item is believed to be in violation of policy. *A copy of the Notice shall also be sent to the person or entity that sent the mail if a return address is identified.*

WW. Unless the prisoner waives his/her right to a hearing in writing by choosing an allowable disposition of the item, and the prisoner and staff agree on the appropriate disposition of the item, a prompt hearing shall be conducted pursuant to Administrative Rule 791.3310 to determine if the mail violates policy for the reason(s) identified in the Notice of Package/Mail Rejection (CSJ-316) and, if so, the appropriate disposition of the mail. The hearings officer shall not be the person who issued the Notice.

XX. If a hearing is conducted, an Administrative Hearing Report (CSJ-144) shall be completed by the hearing officer. The prisoner shall be provided the opportunity to review the mail or a copy of the mail at the hearing unless the review itself would threaten the order and security of the facility, encourage or provide instruction in criminal activity, or interfere with the rehabilitation of the prisoner. If the prisoner is not permitted to review the mail or a copy of the mail at the hearing, the hearings officer shall state the reason for that decision on the administrative Hearing Report. If a summarization was provided for correspondence written in a foreign language, the hearings officer shall review the summarization prior to issuing a finding. The hearings officer may request a full written translation of the correspondence if necessary to issue the finding.

YY. If the hearings officer finds that the mail does not violate this policy, the mail shall be returned to the mailroom to determine if any other violations of policy exist. If other violations exist, the mail shall be processed as set forth in Paragraph VV through XX. If there is no other reason to reject the mail pursuant to this policy, the mail shall be promptly delivered to the prisoner unless it is determined by the Warden or designee that the hearings officer's decision was not supported by policy and a rehearing is ordered.

ZZ. If the hearings officer finds that the mail violates this policy, the hearings officer shall determine the appropriate disposition of the mail as set forth in Paragraph HHH. The disposal option chosen by the hearings officer shall be specifically stated on the Administrative Hearing Report. The hearings officer may take into consideration the prisoner's choice of disposition in making that determination but shall identify only one disposal option on the hearing report.

AAA. Whenever a hearings officer finds that a newspaper, magazine, book, or other publication violates this policy based on its written or pictorial content, the

publication shall be submitted in a timely manner to the Warden along with a copy of the Notice and the Administrative Haring Report. If the Warden does not agree that the publication violates his policy based on its content, that decision shall be noted on the Administrative Hearing Report and the publication promptly delivered to the prisoner with a copy of the Warden's decision. If the Warden agrees what the publication violates this policy based on its written content, s/he shall proceed as set forth in paragraph BBB. In all other cases involving the pictorial content of a publication, the Warden shall make the final decision. The Warden may maintain a list of publications rejected under his/her authority due to pictorial content.

. . .

FFF. Within ten business days after the date of the Notice, the sender may appeal the proposed rejection by sending a letter to the Warden. An appeal received by any other facility staff shall be referred to the Warden as soon as possible. If the mail was referred to the CFA Deputy Director or designee pursuant to Paragraph BBBB, the Warden shall not respond to the sender until a decision is made by the CFA Deputy Director or designee. If the mail was rejected because it was already on the Restrict Publications List, the sender's appeal shall be forwarded to the CFA Deputy Director or designee through the appropriate chain of command for review. In all circumstances, the sender shall be notified in writing whether the appeal is granted or denied. If the appeal is granted, that decision shall be noted on the Administrative Hearing Report and the mail promptly delivered to the prisoner.

ECF No. 57-2 at PageID.711–12 (emphasis added).

Once a publication is rejected, the mailroom clerk completes a CSJ-316 form, a rejection notice to the prisoner. ECF No. 57-11 at PageID.805–06; ECF No. 57-12 at PageID.811–12; ECF No. 57-13 at PageID.817; ECF No. 57-16 at PageID.829–30. A copy of the same form is also sent to the sender, including publishers. ECF No. 57-11 at PageID.805–06; ECF No. 57-12 at PageID.811–12; ECF No. 57-13 at PageID.817; ECF No. 57-15 at PageID.825; ECF No. 57-16 at PageID.829–30; ECF No. 58-6 at PageID.1043; ECF No. 58-21 at PageID.1176. Staff keep a log of rejections. ECF No. 57-12 at PageID.812.

On October 27, 2019, a month after this case was filed, a "reminder" was sent to all staff regarding the mail rejection and notification policies. ECF No. 58-29; ECF No. 58-6 at PageID.1040–41. The notice provided that facilities must comply with the prisoner mail directives

and reminded staff that: "Mail should not be prohibited solely because the content is religious, social, unpopular, etc.[;] Prisoners are prohibited from receiving mail that may pose a threat, including the example situations listed[;] A notice of a rejection must be sent to the sender as well as the prisoner[;] [of the] Levels of review and the appeal process." ECF No. 58-29. The policy (and most mailroom clerks' practices) regarding notice to publishers about rejected publications was the same before and after October 27, 2019. ECF No. 57-12 at PageID.814–15.

MDOC rarely issues state-wide rejection notices of publications. ECF No. 58-6 at PageID.1030. There have been three identified instances when PLN magazines were included in a statewide rejection list, once in 2016, 2017, and 2020. *Id.* at PageID.1030, 1039. Most recently, MDOC employee Norma Killough recommended that an issue of PLN be rejected across the entire state because it included information regarding a former corrupt corrections officer who is now an inmate. ECF No. 57-10.

There is some variation on the approval and rejection of publications between the mailroom clerks at different prison facilities. An MDOC employee explained that variation in approval between facilities occurs because of different geography, custody level, protection units, gang populations, geriatric populations, and medically fragile prisoners, as well as issues specific to the women's prison. ECF No. 58-6 at PageID.1049. In addition, mistakes occur. At least one mailroom clerk rejected an issue of PLN because it included an article about staff sexual abuse at prisons but later admitted that she "probably should not have" rejected the article because "it's just negative news." ECF No. 58-10 at PageID.1102. The same mailroom clerk testified that before the October 2019 reminder, she did not send rejection notices to publishers. *Id.* at PageID.1105. However, her practice has since changed. *Id.* Most rejections are determined by the facility mail clerk, but at least one MDOC mail clerk always reaches out to central staff in Lansing prior to rejecting a

publication from HRDC. ECF No. 57-14 at PageID.822–23. If a piece of mail is rejected, prisoners may appeal the rejection. ECF No. 58-6 at PageID.1042. Publishers also have a right to appeal a rejection. *Id.* at PageID.1043.

## C.

MDOC employees testified that certain articles and issues of PLN were rejected due to their potential to disrupt the secure facilities. In an affidavit, Paul Wright, executive director of HRDC, disputed MDOC's conclusion that the PLN articles would cause unrest in prisons. He explained that "[d]espite some MDOC facilities claiming that PLN articles that mention MDOC prisoners, staff, or problems presented a security threat, the facilities that were actually mentioned in the articles generally appear to have accepted those same issues of the magazine that were censored elsewhere." ECF No. 58-3 at PageID.989. Personally, Wright believes that almost all written material should be permitted in prison. The only exception he identified during his deposition was bomb-making instructions. ECF No. 58-2 at PageID.945.

Multiple mailroom clerks testified that they are not aware of problems that occurred in their prison as a result of PLN articles. ECF No. 58-38 at PageID.1294; ECF No. 58-39 at PageID.1299; ECF No. 58-40 at PageID.1304–05. However, Shawn Brewer, Assistant Deputy Director for the Southern Region at MDOC averred that he has

> personally witnessed or investigated numerous critical incidents, including acts of violence against inmates and staff, suicide attempts, hunger strikes, and group disruptions. [He] ha[s] personally witnessed the consequences of physical contraband being introduced into MDOC facilities, resulting in the use and abuse of drugs and alcohol, or in weapons being used to assault staff and inmates. [He is] intimately familiar with the possible ways prisoners may use seemingly harmless information to intimate, blackmail, strong-arm, and otherwise attempt to gain power and control over correctional staff and other inmates.

ECF No. 57-18 at PageID.841–42.

**D.**

As an exhibit to its Motion for Summary Judgment, HRDC provided a spreadsheet showing PLN monthly magazines that were rejected by at least one facility and whether it received notice of said rejection from September 2016 to April 2021. ECF No. 58-3 at PageID.990–94; ECF No. 63-3 at PageID.1467–68; ECF No. 66-1 at PageID.1783–84. MDOC provided a similar spreadsheet of inmate rejections from October 2020 to March 2021.[1] ECF No. 57-3. MDOC also included the actual rejection notices from October 2020 to March 2021. ECF No. 57-4; ECF No. 57-5. HRDC included the rejection notices it received, but redacted the prison facility that they originated from, making it impossible to confirm the validity of the evidence provided. ECF No. 58-7; ECF No. 58-8.

Defendant argues that HRDC's summary of rejection notices is "inherently unreliable" because the summary "[is] only as reliable as the HRDC staff logging [the notices] into the database and/or the mail system delivering them." ECF No. 64 at PageID.1507. However, Defendant's evidence is equally deficient because she only provides rejection notices beginning in October 2020. As such, neither party included sufficient primary evidence of the rejection letters. Regardless, the information included (addressed in depth in Section III.B.) is sufficient to address the Motions.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the

---

[1] The spreadsheet is titled "from October 2020 to April 2021" but there are no rejections listed for the April edition. It is unclear if there were not rejections in April or if the April edition was not received and distributed when the spreadsheet was created.

record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

Two claims remain for alleged violations of the First and Fourteenth Amendments. Plaintiff seeks injunctive relief against Director Washington. Plaintiff has not asserted a facial challenge but rather an as applied challenge to MDOC's policy. ECF No. 65 at PageID.1580 ("HRDC concedes the Policy's facial reasonableness.").

### A.

The standard for First Amendment challenges to prison policy "is whether the regulations are 'reasonably related to legitimate penological interest.'" *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This standard applies to both prisoners and third parties trying to contact prisoners. *Id.* When evaluating prison regulations, the Supreme Court is clear that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution . . . . Because prisoners retain these rights, '[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'" *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)). However, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482

U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). "Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85.

The Supreme Court articulated four factors to determine whether a prison's restriction on incoming publications was reasonably related to legitimate penological interests: "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (quoting *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (citing *Turner*, 482 U.S. at 89))). If the restriction or practice was reasonably related to legitimate prison concerns, there is no violation of the First Amendment.

The Supreme Court held that "there is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). However, the Sixth Circuit has also explained that prisoners' right to receive mail is "subject to restriction in the interests of prison security" as long as the restrictions "further legitimate penological objectives, in a manner no more restrictive than necessary." *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985). While First Amendment cases state that defendants cannot arbitrarily prohibit prisoners from receiving mail, the case law also provides that deference should be given to prison officials to "further legitimate penological objectives." *Id.* Further, if a warden is concerned that material may cause a riot or disruption, he does not have to wait until problems

emerge. *See Murchison v. Rogers*, 779 F.3d 882, 890 (8th Cir. 2015); *Lawson v. Singletary*, 85 F.3d 502, 512 n.15 (11th Cir. 1996).

### i.

The first factor is whether "there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it." *Harbin-Bey*, 420 F.3d at 578. The "'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Prison Legal News v. Jones*, 2015 WL 12911752, at *13 (N.D. Fla. Oct. 5, 2015), *aff'd sub nom. Prison Legal News v. Sec'y, Fla. Dep''t of Corr.*, 890 F.3d 954 (11th Cir. 2018); *see also Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) ("[After stating the first *Turner* factor:] If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor."). The "governmental objective must be a legitimate and neutral one." *Turner*, 482 U.S. at 89–90. The burden lies with Plaintiff to disprove the validity of the state's regulations. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Plaintiff contends there is no legitimate penological objective to banning PLN articles. It argues "no other prison system in the country is banning HRDC's magazines for the reasons the MDOC is advancing. Even the prisons that would presumably be most interested in censoring the material the MDOC claims is objectionable do not." ECF No. 58 at PageID.902; 903 n.12. Plaintiff does not provide any support for this assertion, save its Executive Director's affidavit. ECF No. 58-3. Plaintiff also included a declaration from Todd Chapman, a federal Bureau of Prisons employee, from a 2015 case in the US District Court of Colorado, but it does not address Plaintiff's specific claims. ECF No. 58-37. HRDC also asserts that MDOC improperly censors "articles that discuss deficiencies within the MDOC itself" and "[w]hile such articles sometimes used strong

language to describe the issues, none of them encouraged or incited prisoners to do anything that would threaten prison security." ECF No. 58 at PageID.903. It contends that PLN articles are not a security threat because the censorship of HRDC magazines and books "is inconsistent and haphazard." *Id.* at PageID.904. It states that "if HRDC's books and magazines were truly a threat to security, they would not be distributed to the prisoners at multiple MDOC facilities, including maximum security facilities, while being rejected at others." *Id.* at PageID.905. Additionally, it argues censorship hinders rehabilitation efforts for prisoners. *Id.* at PageID.906. Despite Plaintiff's claim, it provides no evidentiary support, except for explaining that the November 2017 PLN issue was rejected at two prisons but was delivered to other prisons. *Id.* at PageID.904–05.

Plaintiff contends that neither "publishers nor prison officials like Defendant and MDOC's numerous facility mailroom clerks should have [control over what is allowed in prisons.] It is the First Amendment that controls what publications are allowed in prisons. Prison officials are not free to disregard the Constitution and the body of cases confirming that publishers have a right to send their publications to prisoners." ECF No. 63 at PageID.1447–48. Due to the significant censorship by MDOC, Plaintiff argues that "at the very least there is a disputed question of fact as to whether the information in the articles in question is a security threat." *Id.* at PageID.1451.

In contrast, Defendant explains that "this Court need look no further than the subject matter of the PLN articles that MDOC rejected to dismiss HRDC's argument." ECF No. 62 at PageID.1357. Defendant states that rejected articles include those that "discuss methods of escape, smuggling of contraband, prison riots resulting in prisoner and staff injury or death, and those that identify personal information about MDOC prisoners or staff, all of which clearly jeopardize the safety and security of MDOC prisons." *Id.* at PageID.1357. As for different responses in different prisons, a MDOC representative testified that the populations of each prison vary significantly,

some are older, some medically fragile, some have a larger gang population, etc. *Id.* at PageID.1361; ECF No. 58-6 at PageID.1049. Defendant also argues that it "need not provide evidence of an actual, past unfortunate incident as a result of the subject matter of the rejected publications." ECF No. 57 at PageID.688. Instead, Defendant need only demonstrate that either the "prohibited materials . . . are [ ] likely to cause problems [or] whether a reasonable official might think that the policy advances these interest." *Thornburgh v. Abbott*, 490 U.S. 401, 717 (1989). Defendant explains that "[p]ublications that provide details and/or instructions on how to smuggle contraband could give inmates ideas about how to circumvent security procedures and could normalize the idea that contraband in prisons is just a fact of life. Inmates under the influence of drugs or alcohol pose serious threats to inmates and staff and are disruptive to the orderly administration of prisons, as intoxicated inmates are more likely to act out violently and to require medical attention." ECF No. 57 at PageID.690 (citing ECF No. 57-18, Brewer Declaration)).

The evidence Defendant advances supports her argument. Prisons are given latitude to decide what information is provided to prisoners. *Supra* III.A. Plaintiff may believe that the regulation is applied haphazardly, but it cannot argue that the reasons asserted by Defendant are not legitimate and draw a valid and rational connection between the policy[2] and MDOC's interest in minimizing the potential for harm to inmates and staff in its prisons. Further, the Sixth Circuit has explained that some inconsistency is permitted without violating the First Amendment. *See Thompson v. Campbell*, 81 Fed. App'x 563, 567–68 (6th Cir. 2003). Plaintiff notes that the information in PLN is derived from publicly accessible sources, using the fact as evidence of the unconstitutional policy. However, it fails to identify incidents when the contents of a story were allowed when published in a traditional newspaper but banned when summarized in PLN.

---

[2] HRDC does not challenge the constitutionality of MDOC's written policy.

Defendant has clearly demonstrated that "there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it." *Harbin-Bey*, 420 F.3d at 578.

### ii.

For the second factor, Plaintiff argues there is no other way to get the information to prisoners because MDOC believes the articles are "a threat to security." ECF No. 58 at PageID.907–08. The only alternate means of communication, besides content rejection, is delivery of the articles. Defendant contends "that MDOC is not required to provide publishers alternative means of communicating precisely the same message to the same prisoners." ECF No. 62 at PageID.1366–67. She explains that HRDC can communicate with inmates through non-censored publications and articles. ECF No. 62 at PageID.1366–67. Further, she argues "the majority of HRDC's publications reach its MDOC subscribers [and] HRDC could simply change minor details in the objectionable articles or omit the objectionable articles entirely." ECF No. 57 at PageID.692. Finally, Defendant reasons that "[i]f HRDC is incapable of understanding how an article that alleges MDOC prisoners are being poisoned and compares it to a gas chamber could cause serious disruption, unrest, and potentially even riots in the facility, it is highly unlikely any of the writers or editors at HRDC have the ability to exercise any type of restraint in deciding whether an article poses a potential security concern to the MDOC." *Id.* at PageID.694–65.

The Sixth Circuit held that alternative means of communication do not have to convey the same message to the same prisoner as the rejected communication. *See Thornburgh v. Abbott*, 490 U.S. 401, 417–18 (1989). As Defendant notes, most publications are delivered to inmates. As for prohibited articles, HRDC could make minor edits and the publication would be allowed. For example, an article about a prisoner who escaped from prison in a different state is problematic if it includes an explanation of the "devices [] that assisted him in the process." ECF No. 58-6 at

PageID.1038. But an article that simply mentions the escape likely would not be problematic. *Id.* However, even without changing their strategy, HRDC still has a means to communicate with its inmate subscribers.

<strong>iii.</strong>

Plaintiff explains the fact that "other institutions are effectively able to accommodate the constitutional right in question is good evidence that a particular restriction is not necessary," thereby meeting the third factor. ECF No. 58 at PageID.908. Again, no specific evidence of how other prison systems accommodate all PLN issues was provided. Further, it argues the Michigan inmates and staff at prisons that accept the editions have reported no safety incidents. *Id.* at PageID.908. In response, Defendant cites the Sixth Circuit's decision that when "the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials." ECF No. 62 at PageID.1368 (quoting *Thornburgh*, 490 U.S. at 418 (cleaned up)). Defendant insists that MDOC "has no less strict response available to it that would ensure HRDC's publications reaches as many prisoners as possible without creating security concerns." ECF No. 57 at PageID.697. Further, "HRDC has not, and cannot, propose any easy alternative to MDOC's current mail policy that would not risk compromising institution security, order, and/or the rehabilitation of prisoners." *Id.* at PageID.697.

Defendant rightly states that Plaintiff has not provided an alternate method to better identify problematic publications. Plaintiff has simply insisted that the First Amendment should be the gatekeeper, not MDOC staff. ECF No. 62 at PageID.1368–69. A permanent injunction to enforce the current policy, without additional guidance, would not change current behavior. A permanent injunction to permit all HRDC articles would threaten MDOC's necessary discretion to maintain

order and discipline in the facility. Alternatively, a policy that would require central staff in Lansing to determine which HRDC publications should be delivered to which facilities, instead of allowing a prison by prison determination, would significantly delay mail to inmates.

**iv.**

Finally, because an "obvious, easy alternative[]" exists to the current censorship, i.e., allow all HRDC publications into the facility, Plaintiff argues that the restriction is unconstitutional. ECF No. 58 at PageID.909 (quoting *Turner*, 482 U.S. at 90). Defendant asserts that Plaintiff has the burden to demonstrate an alternate accommodation. ECF No. 62 at PageID.1369 (citing *Thompson*, F. App'x at 568). She states that "[t]he only alternative suggested by HRDC is to simply allow PLN into MDOC facilities." *Id.* at PageID.1369. However, Defendant argues "MDOC has no less strict response available to it that would ensure HRDC's publications reach as many prisoners as possible without creating security concerns." ECF No. 62 at PageID.1369.

As discussed in subsection iii., Plaintiff has not identified any alternate policy to enforce the current MDOC policy guidance. The Sixth Circuit has held that "the absence of ready alternatives [is] evidence of the reasonableness of the regulation." *Harbin-Bey*, 420 F.3d at 578. With no "ready alternative" to the current facility by facility determination, MDOC's policy is reasonable.

Evaluating all four *Turner* factors, Defendant has demonstrated that there is no question of material fact that MDOC is appropriately censoring materials in MDOC prisons. Some variation in restricted materials from prison to prison can be explained by the different prison populations and human error. Further, Plaintiff has not offered any additional guidance for MDOC, absent blanket approval for all HRDC publications. A permanent injunction is not justified. Defendant's

Motion for Summary Judgment on the First Amendment claim will be granted, and Plaintiff's Motion for Summary Judgment on the First Amendment claim will be denied.

**B.**

There are three minimal due process safeguards that must be met after prisoner mail is rejected. First "notice of rejection [must] be given to the inmate-recipient." *Martin v. Kelley*, 803 F.2d 236, 243 (6th Cir. 1986). Second, there must be "an opportunity to protest the decision" to reject the mail. *Id.* at 243–44. Third, there must be an opportunity to appeal the "rejection decision to an impartial third party prior to the letter being returned." *Id.* at 244. The circuit has held that "since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision." *Id.*

Plaintiff argues that despite MDOC's policy requiring notice, for "over half of the rejections between September 2016 and July 2019 no notice was sent." ECF No. 58 at PageID.912. It also contends that "many of the notices that were sent failed to adequately notify HRDC of the grounds for censorship, preventing HRDC from filing a meaningful appeal." *Id.* at PageID.912. Plaintiff advises that MDOC "still failed to consistently send notice of its rejections" after the filing of the instant lawsuit and the October 2019 reminder to staff. *Id.* at PageID.912. Finally, Plaintiff quotes *Howard v. Grinage*, 82 F.3d 1343 (6th Cir. 1996), explaining that the question here is "whether the decision to deprive a person of a protected liberty interest was made more than negligently." *Id.* at 1350.

Defendant argues that HRDC is provided actual notice when it receives rejection notices and constructive notice when they are notified by inmates that the publication was rejected. ECF No. 57 at PageID.682. Defendant further contends that negligent acts by its officials do not result in due process violations. *Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the

Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").

Plaintiff's reliance on *Howard v. Grinage* is misplaced. *Howard v. Grinage* is a § 1983 case where a prisoner alleged that he was improperly placed in segregation and protective custody without due process. 82 F.3d 1343 (6th Cir. 1996). The case was appealed and remanded multiple times. On the third appeal, the Sixth Circuit stated that "where process is altogether denied, the inquiry must focus on the conduct effecting the deprivation, for the government's omission was already erroneous. That is, the constitutional inquiry no longer addresses what process was due and whether it was constitutionally sufficient, but whether the decision to deprive was itself constitutionally defective." *Id.* at 1351. As such, the question becomes, were the mailroom attendants' decisions to deprive HRDC of notice constitutionally defective?

In its Motion, Plaintiff recites the *Howard* court's observation that it is "irrelevant whether the decision to deny [a plaintiff] due process was negligent" but omits the critical sentence that follows: "Rather, the deliberateness of the decision to place [plaintiff] in disciplinary segregation without affording him a written statement as the prison regulations required, was what amounted to an intentional deprivation of a protected liberty interest." ECF No. 58 at PageID.913; *Howard*, 82 F.3d at 1351.

Here, the inmates were notified of the rejection, but the rejection notice was not always mailed to the publisher. With one exception, Plaintiff has provided no evidence that the mailroom clerks' decisions to not inform the publishers was intentional. Plaintiff argues that the one mailroom attendant's testimony that she did not mail the rejection notice to publishers prior to the October 2019 letter is evidence that MDOC employees were more than negligent. ECF No. 58-10 at PageID.1105. However, that same employee later testified that she changed her practice once

she understood the policy. *Id.* The only relief available is injunctive relief. Thus, while the lack of rejection notices from September 2016 to July 2019 is relevant, even more relevant are the rejections that occurred after the beginning of the lawsuit. *Hanrahan v. Mohr*, 905 F.3d 947, 963 (6th Cir. 2018) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." (citing *Renne v. Geary*, 501 U.S. 312, 320–21 (1991))).

This Court cited *Dale E. Frankfurth, D.D.S. v. City of Detroit*, 1987 WL 44769 (6th Cir. Sept. 17, 1987), in an earlier opinion. The Sixth Circuit's analysis there outlines the relevant law:

> We hold that municipal liability under § 1983 attaches—where and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. . . . Appellant was not given notice of the demolition because the clerk forgot to mail the notice. This action was random and unauthorized. The clerk did not act pursuant to an established policy and procedure. Thus, appellant's § 1983 claim must fail.

*Frankfurth,* 1987 WL 44769, at *2.

Plaintiff wrongly asserts that *Frankfurth* is not relevant. However, it correctly argues there is a question of fact about whether MDOC's failure to notify HRDC of the rejections was negligent. MDOC records indicate that from October 2020 to March 2021, 56 individual inmate rejection notices should have been mailed to HRDC. ECF No. 57-3. When analyzed by facility (*i.e.*, counting rejections by facility rather than individual inmate), MDOC records reflect that there were 21 rejections.[3] For the same five-month span, HRDC records indicate that it received notice of 14 rejections from facilities, even though there were a total of 24 rejected issues. ECF No. 63-3; ECF No. 66-1. Plaintiff notes there were three rejections that are not included in MDOC's records (October 2020 at Women's Huron Valley and December 2020 at Carson City and

---

[3] The summary actually indicates 22 rejections, but one is from Women's Huron Valley Prison and does not include which monthly issue of PLN was rejected, so it cannot be compared with HRDC records.

Macomb). Of those three, HRDC received notice of one rejection. Therefore, by MDOC records, HRDC received actual notice of the rejection 66% of the time,[4] and by HRDC records, it received actual notice of rejection 58% of the time.[5] More broadly, HRDC records from September 2019 through April 2021 show that it received notice of rejections 76% of the time[6] (when analyzed by facility). *See* ECF No. 63-3; ECF No. 66-1. MDOC disputes some of HRDC records with affidavits by employees explaining that they did send rejection notices or did not previously send rejection notices but now understand their behavior was mistaken. ECF No. 64 at PageID.1508; ECF Nos. 64-2; 64-3; 64-4; 64-8; 64-9. However, these affidavits do not resolve the question of whether all of MDOC's apparent failures were negligent.

Defendant correctly asserts that HRDC's non-receipt of the rejection notices might be the result of simple negligence. Indeed, Plaintiff has not shown that the lack of notice was the result of intentional wrongdoing, and for that reason Plaintiff's Motion as to Count II will be denied. But on the other hand, Defendant has similarly not carried its burden to demonstrate that the lack of notice was the result of simple negligence. HRDC received notice of the rejections somewhere between 58% to 76% of the time. Without further evidence, this Court cannot conclude that a failure to notify rate of 24% to 42% is solely the result of negligence. *See Prison Legal News v. Jones*, 2015 WL 12911752, at *23 ("The systemic failure of FDOC personnel to provide notice 42% of the time reveals that the failures were not coincidental." FDOC's behavior "exceed[s] negligence."). If MDOC employees were following policy, especially after the October 2019 notice from Director Washington, HRDC should have received rejection notices more than 76% of the time. Of note, even when notice is received, it does not always identify the publication at

---

[4] 14 rejection notices received divided by 21 rejections.
[5] 14 rejection notices received divided by 24 rejections.
[6] 50 rejection notices received divided by 65 rejections.

issue that is being rejected. The Women's Huron Valley rejection notices do not identify what mail item is being rejected, let alone which specific PLN issue. ECF No. 57-5 at PageID.782–86. Defendant's motion for summary judgment on the Fourteenth Amendment claim will be denied.

## IV.

On May 28, 2021, Plaintiff filed a motion for leave to file a supplemental declaration correcting two errors in his original declaration. ECF No. 66. The original declaration incorrectly stated that two rejection letters were not sent to HRDC regarding the December 2020 issue to Chippewa and Handlon prisons. This Court has discretion to allow parties to submit amended affidavits. *See Morgan v. Gandalf, Ltd.*, 165 Fed. App'x 425, 433 (6th Cir. 2006). Here, the amended declaration explains an error in the original affidavit. Further, Defendant first highlighted the discrepancy in its reply brief. ECF No. 64 at PageID.1508. Defendant opposes the Motion, but there is no prejudice to either party and Plaintiff did not act in bad faith. Plaintiff's Motion will be granted and the supplemental declaration will be accepted.

On June 3, 2021, seven weeks after motions for summary judgment were filed and three and a half weeks before oral argument, Defendant filed a motion to strike Plaintiff's rebuttal expert John Clark. ECF No. 67. This Court did not rely upon Mr. Clark's report in its analysis of the parties' summary judgment motions. Because the Defendant's motion to strike only seeks to strike the report from Plaintiff's Motion for Summary Judgment (rather than seeking to exclude it at trial), it will be denied as moot.

## V.

Accordingly, it is hereby **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 58, is **DENIED**.

It is further **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 57, is **GRANTED IN PART AND DENIED IN PART**. Count I is dismissed, but Count II remains.

It is further **ORDERED** that Plaintiff's Motion for Leave to File Supplemental Declaration Correcting Error, ECF No. 66, is **GRANTED**.

It is further **ORDERED** that Defendant's Motion to Strike Plaintiff's Rebuttal Expert Report, ECF No. 67, it is **DENIED AS MOOT**.

Dated: July 9, 2021                                    s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge